**In re FRONTIER AIRLINES, INC., et al., Debtor(s).**

**Bankruptcy No. 86 B 8021 E.**

United States Bankruptcy Court, D. Colorado.

Dec. 12, 1988.

See also, Bkrtcy., 88 B.R. 332, Bkrtcy., 84 B.R. 724, Bkrtcy., 74 B.R. 973.

Carl A. Eklund, John E. Maas, Faegre & Benson, Denver, Colo., for debtors.

Bruce R. Zirinsky, Brian S. Rosen, Weil, Gotshal & Manges, New York City, for Continental Airlines, Inc. and New York Airlines, Inc.

Randall J. Feuerstein, Welborn, Dufford, Brown & Tooley, Denver, Colo., for Air Line Pilots Ass'n and Ass'n of Flight Attendants.

Richard A. Winkel and Richard S. Shaffer, Denver, Colo., for "Winkel Group".

Ronald M. Martin, Holland & Hart, Colorado Springs, Colo., for Sky Chef, Inc.

Michael E. Katch, John B. Wasserman, Katch, Anderson & Wasserman, Denver, Colo., for Unsecured Creditors Committee.

Hollace T. Cohen, Whitman & Ransom, New York City, for U.S. Trust Co. of New York.

George A. Smith, Denver, Colo., for "Pender Group".

Denis H. Mark, Waller, Mark & Allen, Denver, Colo., and David W. Pollard, Swift, Currie, McGhee & Hiers, Atlanta, Ga., for "Andrew Group".

Glenn A. Bergmann, Lakewood, Colo., for the "Bunn" Group.

Stephen A. Shirey, Denver, Colo., for U.S. Trustee.

Albert Mas, Aurora, Colo., pro se.

Dolores Kopel, Denver, Colo., and Van Oliver, Andrews & Kurth, Dallas, Tex., for Schlumberger Technology Corp.

## ORDER AND OPINION ON MOTION TO CONFIRM

CHARLES E. MATHESON, Chief Judge.

This matter came before the Court on the motion of the Plan Proponents herein to confirm a Chapter 11 plan for the estates of these debtors. The plan that the Court has before it is the Modified Third Amended Consolidated Plan of Reorganization ("Modified Plan") as proposed by Frontier Holdings, Inc. ("Holdings"), Frontier Airlines, Inc. ("Frontier"), Frontier Leaseco One, Inc. and Frontier Leaseco Two, Inc., as the Debtors ("Debtors"), and Continental Airlines, Inc. ("Continental"), the holder of 100% of the outstanding stock of Holdings, and New York Airlines, Inc. ("New York Air"), also a wholly owned subsidiary of Continental, as co-proponents with the Debtors (the "Proponents").

 Under the plan of reorganization as originally presented to the Court for confirmation, the Proponents proposed to pay all allowed claims in cash in an amount equal to each allowed claim as of the date of the filing of the petition herein with interest on such claim from the effective date of the plan to the date of actual payment thereof. The Modified Plan now before the Court proposes to substantively consolidate the estates of the four debtors. The evidence presented at the confirmation hearing indicated that two of the debtors (Leaseco One and Leaseco Two) have no outside third-party creditors. Holdings, the parent corporation, has some outstanding third-party debt, primarily in the form of debentures which it had issued. However, substantially all of the debt has been accrued by Frontier. The evidence established that virtually all transactions had been undertaken through Frontier and that the books and records of the companies did not clear-ly define the separate assets and liabilities such that a complete financial separation of the entities would be difficult to accomplish. No party in interest has objected to the substantive consolidation. Under the evidence presented the Court concluded that good grounds exist for the substantive consolidation of the entities.

The consolidated estates have assets of approximately $163,000,000, consisting of cash, a few accounts receivable, miscellaneous claims totalling not in excess of $20,000,000, and a promissory note payable to the Debtors by New York Air in the face amount of approximately $52,000,000, payment of which is guaranteed by Continental.

The total claims filed against the estates are in excess of One Billion Dollars ($1,000,000,000). Numerous claims' objections have been filed by the Debtors and many more are anticipated. The Debtors have evaluated the claims and have subjected those evaluations to various probability analyses. Pursuant to those evaluations, the Debtors presented evidence at the Confirmation Hearing tending to establish that under a worst-case scenario, the aggregate creditor claims will ultimately be reduced to the point that after all allowed claims have been paid there will remain assets in the estate having a value in excess of $20,000,000 which can be distributed to the equity security holder. On a very best-case scenario, (assuming the Debtors prevail fully on *every* disputed matter—a highly unlikely event) the distribution to the equity security holder could reach $80,000,000 or more. Thus, premised on the evidence presented, the Court concluded that the Debtors, as consolidated, are solvent, having assets which exceed in value the amount of debt which would be allowed and paid. Further, since the assets are all cash or near cash equivalents, the value of the assets would not be significantly reduced if this proceeding were converted to Chapter 7, provided the Trustee is not forced to a precipitate sale of the New York Air note.

The Modified Plan recognizes that it may take some time before claims' disputes are

resolved and a determination can be made that there will, in fact, be cash available to pay all allowed claims. The Modified Plan has established a mechanism to escrow cash and retain assets during this claims' determination period with reserves to be established against contested claims pending final allowances. At such time as it is clearly established that the available assets exceed all claims which have been finally allowed, or remain reserved against, distributions to the holders of allowed claims can commence. Such distributions will include interest on the claims from the effective date of the Modified Plan to the date of payment at the rate specified in the Modified Plan.

The plan as originally presented did not propose to pay interest on the allowed claims for the period extending from the filing of the Chapter 11 proceedings to the effective date of the plan. The Court questioned whether it could find that plan met the "best interests" test mandated by 11 U.S.C. § 1129(a)(7) in light of the fact that the value of the Debtors' assets is likely to exceed the amount of the finally allowed claims and the plan did not propose to pay post-petition interest. Since the creditors likely would receive post-petition interest on their claims in Chapter 7, pursuant to the requirements of 11 U.S.C. § 726(a)(5), confirmation of the plan as proposed was in question. At the Proponents' request, the Confirmation Hearing was continued and the Proponents were given leave to amend.

On October 31, 1988, the Proponents filed their Modified Plan, the consideration of which is now before the Court. The Modified Plan still provides that creditors who elect to do so will receive payment in cash for their claims as the same are allowed as of the date of the filing of the petition herein and without post-petition interest thereon. However, in the absence of such an election, creditors are to receive a combination of cash and notes such that the property (cash and notes) to be distributed on a creditor's claim will have a value on the effective date of the Modified Plan equal to the allowed amount of the claim plus interest thereon at the rate specified

in the Modified Plan (which is at least equal to the legal rate).

The notes to be issued under the Modified Plan will be notes of New York Air bearing the same interest rate and payable on the same terms as the New York Air note presently held by Frontier. The notes will also be guaranteed by Continental. To the extent such notes are issued to creditors, a reduction will be made in the face amount of the New York Air note which is payable to and held by Frontier. ·

The Court heard evidence by expert witnesses concerning the fair market value of the New York Air note. That evidence was primarily premised on the value in the market place of short-term unsecured commercial paper of Continental. That evidence established a range of values from 93% to 96% of the face amount of the note, such that the note would trade in the market at a discount to yield 15.25 to 17%. The experts both testified that the smaller notes to be issued to the creditors under the Modified Plan should have the same value and trade in the same range in the market place as the note now held by Frontier. The Court, therefore, found on the record at the Confirmation Hearing, premised on such evidence, that the individual notes to be issued to the creditors would have a value equal to 94% of the face amount of the notes. Under the Modified Plan no more than 40% of a creditor's claim can be satisfied by such notes. Recognizing the discounted value of the notes in making distributions, a creditor will receive notes having a face value equal to 106.38% of the amount of the claim to be satisfied by the notes.

At the continued Confirmation Hearing on the Modified Plan, the Court heard supplemental evidence and arguments of counsel. The Court then made its findings on the record and concluded that the Modified Plan, and the Proponents, met the requirements for confirmation set forth in 11 U.S. C. § 1129(a)(1), (3), (4), (5), (6), (9), (11) and (12). The Court took under advisement the question of whether the provisions of Section 1129(a)(2), (7), (8) and (10) had been met.

To resolve the question of whether the Modified Plan should be confirmed requires inquiry into two separate but related concepts. As noted, the Modified Plan proposes to issue New York Air notes to the creditors in satisfaction of the claims. The issuance of securities is normally subject to the registration requirements of Section 5 of the 1933 Securities Act, unless exempted in some manner. The exemption relied on by the Proponents is that provided by Section 1145 of the Bankruptcy Code. The question must be addressed whether such an exemption is available. Assuming the exemption applies, the Court must then consider whether the Modified Plan can be confirmed or whether it must first be submitted to a vote of the unsecured creditors.

█ Section 1145 of the Code purports on its face to provide an exemption from Section 5 of the 1933 Securities Act for securities issued to creditors in satisfaction of claims in connection with a plan. In particular, Section 1145 provides:

(a) Except with respect to an entity that is an underwriter as defined in subsection (b) of this section, section 5 of the Securities Act of 1933 (15 U.S.C. 77(e)) and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security does not apply to—

(1) the offer or sale under a plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan—

(A) in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; or

(B) principally in such exchange and partly for cash or property; ....

The confusion in applying this provision of the Code arises because of the definition of "underwriter" in Section 1145(b) of the Code. That section states:

(b)(1) Except as provided in paragraph (2) of this subsection and except with respect to ordinary trading transactions of an entity that is not an issuer, an entity is an underwriter under Section 2(11) of the Securities Act of 1933 (15 U.S.C. 77(b)(11)), if such entity—

....

(D) is an issuer, as used in such Section 2(11), with respect to such securities.

Thus, it appears from a facial reading of the statutory language that an "issuer" is an underwriter and is, therefore, excepted out of the otherwise available exemption under Section 1145(a). If so, the result would be that the New York Air notes to be issued under the Modified Plan would not be exempt from the registration requirements of Section 5 of the 1933 Securities Act and that, in order to issue such notes, New York Air would have to file and have effective a registration statement under the 1933 Securities Act.

The Court inquired at the conclusion of the Confirmation Hearings whether the battery of lawyers present for the Proponents could offer a cogent and logical explanation for the seemingly incomprehensible statutory provisions. None could. Neither have they offered in their post-hearing briefs any rational explanation of why Congress inserted the "exception" in the opening phrase provisions of Section 1145(a).

The obligation of the Court is to construe and apply the law as it is written. The Court is neither an advocate nor an adversary, and arguments espoused by the judge in a former role as an advocate are irrelevant to a resolution by the Court of how the law ought properly to be applied.

No one can dispute the intent of Congress in passing Section 1145 of the Code. That intent was to provide a limited exemption from the registration requirements of the 1933 Securities Act for certain securities to be issued under a plan. As the legislative history points out, the exemption of Section 1145(a) is consistent with the exemption previously available under Section 264 of the predecessor Bankruptcy Act. *See*, H.R. Report No. 595, 95th Congress, First Session, 419–420 (1977), U.S. Code Cong. & Admin.News 1978, 5787.

It has been observed that to construe the two provisions of Section 1145(a) and 1145(b)(1)(D) literally would emasculate the seemingly offered exemption. *In re Stanley Hotel, Inc.*, 13 B.R. 926, 932 (Bankr.D. Colo.1981). Even Congress has recognized that the statutory language is capable of being so read and initiated steps to resolve the problem by proposing an amendment to Section 1145(a). That amendment was passed by the Senate on July 17, 1981 as Section 111(a) of the "Bankruptcy Amendments Act of 1981" (S.863) and states:

> Section 1145(a) of title 11 of the United States Code is amended—
>
> (1) by striking out "Except with respect to an entity that is an underwriter as defined in subsection (b) of this section, section" and inserting "Section" in lieu thereof....

In explaining the proposed change the Senate Report stated:

> Subsection 1145(a) confuses separate aspects of initial distribution and resale. Without this amendment, section 1145(a) could be interpreted to restrict the issuance and distribution of securities by underwriters at both the initial distribution and secondary stages, which was not the intent of Congress. The effect of the amendment will place controls on underwriters at the resale stage where they are appropriate. S.Rep. No. 97–150, 97th Cong. 1st Sess. (1981) 21.

That bill languished and died without enactment by the House of Representatives. Thus, the problem of statutory construction remains.

The Bankruptcy Code is remedial legislation and ought to be liberally construed. *Israel–British Bank (London) Ltd. v. Federal Deposit Insurance Corporation*, 536 F.2d 509, 513 (2nd Cir.1976); *Tigr Restaurant v. Rouse S.I. Shopping Center*, 79 B.R. 954, 956 (Bankr.E.D.N.Y.1987); *Matter of Maidman*, 2 B.R. 569, 575 (Bankr.E. D.N.Y.1980), aff'd 668 F.2d 682 (2nd Cir.

1982). An analysis of the statute should begin with the language of the statute itself. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). If the language is unambiguous, it ought to be applied as written without further resort to legislative history. *Central Trust Company v. Official Creditors' Committee*, 454 U.S. 354, 359, 360, 102 S.Ct. 695, 697–98, 70 L.Ed.2d 542 (1982); *In re BAV, Inc.*, 68 B.R. 411 (Bankr.D. Colo.1986). However, if the statutory language is ambiguous, resort to the legislative history is appropriate so that the statute can be interpreted to effect its evident purpose and be consistent with legislative intent. *Rocky Mountain Oil and Gas Ass'n v. Watt*, 696 F.2d 734 (10th Cir.1982).

It has been suggested that the ambiguity in the statute can be resolved by distinguishing between so-called "technical" underwriters and "real" underwriters and by limiting the reference to "issuer" in Section 1145(b)(1)(D) to mean "control person." [1] 5 Collier on Bankruptcy, 15th Ed., ¶ 1145.03 at page 1145–36 (Matthew Bender, 1988). However, there is nothing in either the statute or the legislative history that gives sanction to such a restricted reading of the clear legislative language set forth in Section 1145(b)(1)(D) in defining "issuer."

Assistance in construing the statute can be found in the previously enacted parallel provisions of the Bankruptcy Act and the legislative history pertaining to those provisions. Section 264 of the Bankruptcy Act, as amended June 22, 1938 (c. 575, § 1, 52 Stat. 902, 11 U.S.C. § 664) provided in pertinent part:

> a. The provisions of section 5 of the Securities Act of 1933 shall not apply to—
>
> . . . .
>
> (2) any transaction in any security issued pursuant to a plan in exchange

---

1. This reasoning appears to stem from the reference in Section 1145(b)(1)(D) to the definition of "issuer" in Section 2(11) of the 1933 Securities Act. That section defines "issuer" as follows:

As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

for securities of or claims against the debtor ... except

(a) transactions by an issuer or an underwriter in connection with a distribution otherwise than pursuant to the plan....

The effect of Section 264 is discussed in the following excerpts from the Senate Report No. 1916, 75th Congress (3rd Sess.):

Section 264 is derived in part from section 77B(h). Under this provision no registration in compliance with the Securities Act of 1933 is required for the issuance of securities to the security holders or creditors of the debtor in whole or part exchange for their old securities or claim. However, new issues sold by the reorganized company for cash are required to be registered under the Securities Act just as any other new issue of securities, in order that prospective investors may have all material information before buying. *Furthermore, the exemption for the issuance of securities to security holders and creditors under the plan does not extend to any subsequent redistribution of such securities by the issuer or an underwriter; for any such redistribution is subject to the same need for public disclosure of relevant data as in the case of a new issue.* (emphasis added.) *Ibid* at page 38.

The exemption provided by Section 264 of the predecessor statute was broader in concept than that provided by Section 1145(a) of the Code. Section 264 of the Act applied to "any transaction" in "any security issued pursuant to a plan...." By its terms, unless otherwise limited the exemption applied not only to the original distribution, but to any subsequent redistribution, even one effected by or through an underwriter. In order to limit the broad reach of the exemption, Congress *excepted* transactions by "an issuer or an underwriter in connection with the distribution otherwise than pursuant to a plan...."

The exemption scheme under Section 1145(a) is different from that of the predecessor Section 264. Section 1145(a)(1) does not exempt "any transaction." It exempts only the offer and sale of certain defined securities "under a plan...." Thus, by its terms, Section 1145(a)(1) applies only to the initial offering under the plan and not to any redistribution. The inclusion of the phrase "except with respect to an entity that is an underwriter ..." in Section 1145(a) is consistent with the exception specified in the predecessor Section 264, and the purpose is obviously the same, which is to prevent the *redistribution* of the securities issued under a plan without compliance with Section 5 of the 1933 Securities Act. The carryover of that phrase from Section 264 into Section 1145(a) was surplusage, however, in light of the more limited exemption provided by Section 1145(a)(1). This conclusion is confirmed by the proposed legislative amendment discussed above which would have conclusively dealt with the problem by simply striking the offending exception from Section 1145.

■ Having considered the Code in light of its legislative history and that of the predecessor statute, the Court concludes that the exception to the exemption from the 1933 Securities Act provided by Section 1145(a)(1) was intended to, and should, be limited to "underwriters" as defined in Section 1145(b) who are engaged in making a redistribution of securities otherwise validly issued under a plan. In the instant case, there is no indication that New York Air is engaging in a redistribution of the notes it proposes to issue under the Modified Plan, and the exemption provided by Section 1145(a) is not lost to the Proponents simply because New York Air is an "issuer" of the notes.

The inquiry does not stop there. The Court must still consider whether the exemption provided by Section 1145(a)(1) is available in this case in any event.

■ As heretofore observed, the exemption under Section 1145(a)(1) is not as broad as under the predecessor act. The present exemption does not apply to all transactions. It applies only to the issuance under a plan of securities (a) of the debtor, (b) of a successor to the debtor under the plan, or (c) "of an affiliate participating in a joint plan with the debtor." New York Air is

not the debtor, nor will it be a successor to the debtor under the Modified Plan. Thus, the exemption only applies if New York Air is "an affiliate participating in a joint plan with the debtor."

New York Air is a wholly-owned subsidiary of Continental, as is Holdings, one of the Debtors herein. As such, New York Air is an "affiliate" of the Debtors herein within the meaning of 11 U.S.C. § 101(2). New York Air has joined with the Debtors and with Continental as proponents of the Modified Plan. The Proponents argue that New York Air is therefore an "affiliate participating in a joint plan with the debtor."

The phrase "affiliate participating in a joint plan with the debtor" appears in three sections of the Code; to wit, Section 1145(a)(1), Section 1129(a)(5)(A) and Section 1125(e). There are no cases construing the meaning of the phrase under any of the sections. The legislative history is equally devoid of any indication of why the securities of an affiliate (a parent company, for example) to be issued under a plan will be exempt from registration *only* if the affiliate is "participating in a joint plan with the debtor." Certainly the exemption, as so limited, is much more narrow than that provided by the predecessor Section 264 which exempted "any transaction in any security issued pursuant to a plan...."

The Securities and Exchange Commission ("SEC") is the administrative agency charged with the enforcement of the securities laws. It has clearly abdicated its role in the reorganization area in favor of the bankruptcy court and has not only acceded to but has espoused the most liberal interpretation possible of Section 1145. This attitude is demonstrated in the case of *In re Amarex, Inc.*, 53 B.R. 12 (Bankr.W.D. Okla.1985).

The reorganization plan in the *Amarex* case proposed to merge the debtor into a wholly-owned subsidiary of Templeton Energy, Inc. ("Templeton"). The creditors of Amarex were to receive under the plan shares of Templeton stock. The question arose as to whether the Section 1145(a)(1) exemption would apply since Templeton, as

the issuer of the shares, was technically not the successor to the debtor under the plan. Chief Bankruptcy Judge Bohanan held that the exemption was available, and noted the supportive position of the SEC, stating:

There do not appear to be any reported decisions dealing with the issue of whether Templeton cannot qualify for the exemption because technically it may not be a successor. At the court's request the Securities and Exchange Commission has served and filed its memorandum on the issue. The Commission points out that in several occasions it has issued "no-action" responses in similar circumstances and urges that the court hold that the exemption would apply.

The obvious purpose of section 1145 is to encourage reorganization and to relieve bankrupt entities of the strict requirements of securities laws so long as adequate disclosure is made. Templeton, the parent, reports under the Securities Exchange Act of 1934 and information concerning it is available through that source and the disclosure statement, when and if it is approved.

In its memorandum, the Commission states "[w]e do not believe the policies of the Code would be served by reading the 'successor' language in section 1145(a)(1) so narrowly as to render the triangular acquisition alternative unavailable under Chapter 11." This reasoning is persuasive and is in keeping with Congress' intent that reorganization be facilitated without following the registration requirements of the Securities Act of 1933 where adequate information is provided through the reorganization disclosure process. *In re Amarex, Inc., supra* at 14.

Similarly benign positions have been taken by the staff of the SEC in issuing "no-action" letters advising that the staff would not recommend enforcement actions for violations of the Securities Act where securities are being issued pursuant to a plan by entities other than the debtor, an affiliate participating in a joint plan with the debtor, or the true successor to the debtor under a

plan. *See, e.g.,* Re: American Home Products Corp., 1988 SEC No–Act., Lexis 902; Re: Rorer Group, Inc., 1988 SEC No–Act., Lexis 5.

The position taken by the staff of the SEC which was acceded to by the Court in the *Amarex* case, *supra,* is consistent with the remedial purposes of the Bankruptcy Code. Also, in light of Section 1125 of the Code, this position is not inconsistent with the policy of the 1933 Securities Act to require full disclosure in connection with the sale of securities. Certainly there appears to be no sound policy reason to require compliance beyond a literal reading of the statute. Here, New York Air, an affiliate of the Debtors and the issuer of the securities, is participating jointly with the Debtors in the Modified Plan. The Court concludes, therefore, that neither Section 5 of the 1933 Securities Act nor any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of or broker or dealer in a security, applies to the offer or sale under the Modified Plan herein of the New York Air notes which will be issued in partial satisfaction of the claims of the unsecured creditors of these Debtors' estates.

The plan, as originally proposed and as presented to the Court at the initial Confirmation Hearing, had been submitted to the creditors for a vote as required by the Code and had been accompanied by a disclosure statement approved by the Court pursuant to the provisions of Section 1125 of the Bankruptcy Code. No solicitation of the creditors has been made with respect to the modifications effected in the now tendered Modified Plan. The question, therefore, remains whether the Debtors' Modified Plan can be confirmed without a resolicitation of acceptances.

■ The Code contemplates the possibility of plans being amended and specifies, in Section 1127:

(a) The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

(b) . . . .

(c) The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

(d) Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

Bankruptcy Rule 3019 also deals with the problem of plan acceptances after an amendment is made. It specifies:

After a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

In the present case the unsecured creditor classes voted to accept the plan before its most recent modification. The Proponents argue that pursuant to B.R. 3019, those acceptances should stand unless the Court finds that the final modifications are materially adverse to the interests of the accepting creditors, citing *In re American Solar King Corp.,* 90 B.R. 808 (Bankr.W. D.Tex.1988).[2]

**2.** At the confirmation hearing the Proponents argued, as an alternative, that the Court could assume the Modified Plan to be rejected by the unsecured creditors and confirm the Plan under the cram-down provisions of § 1129(b). That alternative is not available because the Plan, under these circumstances, would not meet the confirmation requirements of § 1129(a)(10).

This Court does not agree with such an expansive reading of B.R. 3019. The Court notes that subsection (f) of Section 1127, as proposed in the original Senate bill, provided that a proponent of a modification to a plan did not have to resolicit unless the court found the modification made a "materially" adverse change in the treatment of the creditors. *See*, S.2266, Calendar No. 1026, page 533, 95th Cong. 2nd Sess. (1977). The language included in the Senate bill was not enacted. Both the change in the legislative proposal and the express language of B.R. 3019 indicate that the Court should not disenfranchise creditors from having an opportunity to vote on plan modifications based on the degree of the hurt. If the modification adversely affects the interests of a creditor who has previously accepted the plan, in more than a purely ministerial de minimis manner, that creditor should have the opportunity to reconsider and change his or her vote.[3]

The Proponents argue that the changes made in the Modified Plan are not adverse and that resolicitation is not required in any event. That argument is advanced on the proposition that under the Third Amended Plan all unsecured creditors were to be paid in cash the amount of their allowed claims as of the date of the filing of the petition. Under the Modified Plan the creditors will have the option of receiving cash in the same amount as was previously proposed or, in the alternative, of receiving cash and New York Air notes having an aggregate value equal to the allowed amount of the claim plus interest thereon at the legal rate from the date of the filing of the petition to the effective date of the Modified Plan. Under these circumstances, the Proponents argue that the creditors are not only at least as well off as they were before, they can actually improve their positions and receive greater distributions than had previously been proposed.

The Proponents' argument ignores, in a facile manner, the economic realities of what is occurring. Under the plan modification creditors will receive cash and notes unless they affirmatively elect to take cash only. This is a subtle, but undoubtedly effective, way to heighten the likelihood that most creditors will, by default, have their claims satisfied with cash and notes.

There is not at the present time cash available in an amount sufficient to pay all claims in full. In fact, as discussed above, there will not be enough total assets available to pay all of the claims which have been filed in this estate. The Modified Plan contemplates that there will be continuing claims' hearings post-confirmation, with distributions to be made at such time as it is clear that the assets held in the estate exceed the amount of all claims allowed and to be allowed.

The Debtors have estimated that under any reasonable expectation of results the worst that could be expected to occur in this case would be that there would remain approximately $20,000,000 in assets over and above the claims expected to be allowed as of the date the case was filed. That "worst case" cushion must be reduced to the extent creditors elect to receive postpetition interest by taking cash and notes under the Modified Plan.

Under the plan accepted by the creditors, all unsecured creditors whose claims were ultimately allowed would have the cushion of all remaining assets to provide assurance for the payment of their claims. Under the Modified Plan, however, creditors

---

**3.** In the *American Solar King Corp.* opinion, 90 B.R. 808 (Bankr.W.D.Tex.1988), the court opined that the materiality of a modification is to be determined by the question of whether it will affect an investor's voting decision. The Court states:

> The severity of the modification need not be such as would motivate a claimant to *change* their vote—only that they would be apt to *reconsider* acceptance. A modification which is not likely to trigger such reconsideration *de*

*facto* satisfies Section 1125 disclosure requirements. *Ibid* at 824.

This Court is not willing to place itself in a position of weighing whether the modification is so adverse that a creditor would be apt to reconsider acceptance. In this Court's view it is the creditors' inherent right to make that baseline decision if the modification to the plan results in a change which is adverse to the creditors' interests.

electing to take cash and notes will receive a larger allocation of the assets of the estate. They will be allocated property (cash and the market value of notes) equal to the allowed amount of their claims plus post-petition interest thereon. Further, due to the discounted market value of the notes as previously determined by the Court, to the extent creditors are allocated notes, they will receive them in a face amount equal to 106.38% of the dollar amount of the claim being discharged by the notes. Put another way, allocating post-petition interest (and a premium allocation of 106.38% on the notes) to certain of the creditors has the obvious impact of increasing the dollar amount of the creditor claims to be paid by the available assets. The result of the plan modification is that unsecured creditors who elect to take only cash in the allowed amount of their claims will suffer a shrinkage in their proportionate interest in the remaining pool of assets available to assure the payment of their claims. The Court is unable to quantify the exact amount of the shift in the asset base. Indeed, it will depend ultimately on the election to be made by the creditors. But, without question, there will be an effective increase in the allowed claims to be satisfied by the Debtors' assets.[4] That is a change which is adverse to the interests of the creditors and, under the Court's view of B.R. 3019, mandates that the creditors should be given the opportunity to change their votes.

Further, the policy of the Code supports the Court's conclusion. Critical to the availability of the exemption under Section 1145(a)(1) are the workings of the disclosure requirements of Section 1125 of the Code. *In re Amarex, Inc., supra.* The Proponents have offered to prepare and distribute to the creditors, prior to their making their election to take cash or cash and notes, information concerning New York Air. Having such information available after the plan has been voted on and confirmed does not have the same salutary effect, nor does it fill the same purpose, as does compliance with Section 1125.

Having considered the arguments presented, the Court concludes that the Modified Plan must be denied confirmation for failure to meet the requirements of Section 1129(a)(2) due to the failure of the Proponents to comply with Section 1125 and with B.R. 3019. In addition, the plan, as modified, fails to meet the requirements of Section 1129(a)(10) because it has not been accepted by at least one class of impaired claims. B.R. 3019. The Proponents' motion to confirm the Modified Third Amended Plan is, therefore, denied with leave to the Proponents to resolicit the unsecured creditors pursuant to the provisions of B.R. 3019 and 11 U.S.C. § 1127(c).

---

**4.** Assuming one-half the creditors elect to take cash, and that the final allowed claims equal $150,000,000 (vs. $170,000,000 in assets), the claims to be paid would increase to slightly in excess of $164,000,000, resulting in a 70% reduction of the "cushion" available to assure full payment of claims.