**In re SEATCO, INC., Debtor.**

**No. 00–37332–BJH–11.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Jan. 19, 2001.

---

1. The Court's ruling does not mean that the contract itself was assignable. *See* discussion *supra* Part II.E.1.b.

Paul B. Geilich, John K. Turner, Bell & Nunnally & Martin, L.L.P., Dallas, TX, for Debtor.

Gregory G. Hesse, Leslie R. Masterson, Jenkens & Gilchrist, A.P.C., Dallas, TX, for Creditor CIT Group/Business Credit, Inc.

### *MEMORANDUM OPINION*

BARBARA J. HOUSER, Bankruptcy Judge.

This contested confirmation hearing concluded on January 8, 2001. Seatco, Inc. ("Seatco" or the "Debtor") seeks an order from this Court confirming its Second Amended Plan of Reorganization, as modified on January 3, 2001. CIT Group/Business Credit, Inc. ("CIT") objects to confir-

mation. The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding. 28 U.S.C. § 157(b). This Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this action by Federal Rule of Bankruptcy Procedure 7052.

## I. UNDERLYING FACTS

The Debtor manufactures custom van and truck seating and related accessories for the van and truck conversion industry. The Debtor also manufactures and installs leather seat covers for passenger vehicle dealers where such passenger vehicles are not optioned with leather by the original manufacturer.

CIT is the Debtor's principal secured creditor. On or about May 30, 1996, CIT and the Debtor entered into a loan and security agreement (the "Prepetition Loan Agreement"). Pursuant to the Prepetition Loan Agreement, CIT made revolving loans to the Debtor as well as a term loan in the amount of $190,000. As security for its obligations under the Prepetition Loan Agreement, the Debtor granted CIT a security interest in substantially all of its assets, including real estate, equipment, accounts receivable, and inventory (collectively, the "Collateral"). As further assurance for the payment of its claim, CIT was given a payment guaranty (the "Guaranty") by Earl Kester ("Kester"), the Debtor's president.

As a result of a combination of factors—including borrowing costs with CIT, loss of business due to putatively substandard materials provided by a third party vendor, and market shrinkage—the Debtor filed for relief under Chapter 11 of the United States Bankruptcy Code (the "Code") on August 2, 2000. On September 27, 2000, the Debtor filed a statement of its election to be treated as a small business pursuant to Bankruptcy Rule 1020. On October 12, 2000, the Debtor filed its Plan of Reorganization and its Disclosure Statement. The Debtor filed its First Amended Plan of Reorganization and its First Amended Disclosure Statement on November 13, 2000. The Court conditionally approved that Disclosure Statement on November 13, 2000 over CIT's objection. The Debtor filed its Second Amended Plan of Reorganization on November 30, 2000 and its Modification to Debtor's Second Amended Plan of Reorganization on January 3, 2001 (hereinafter collectively referred to as the "Plan").

The Plan divides creditors and the interest holder into seven classes. Class 1 consists of certain secured priority tax claims against the Debtor. Although these claims are impaired under the Plan, they are paid in full and the creditors retain their prepetition liens. No Class 1 creditor objects to confirmation of the Plan.

Class 2 consists of the claims of CIT. CIT is impaired under the Plan, voted to reject the Plan, and objects to confirmation.

Class 3 consists of the claims of creditors with liens on certain vehicles and equipment of the Debtor. Class 3 claims are unimpaired under the Plan. Although one Class 3 creditor, Home Bank, initially objected to confirmation of the Plan, that objection has been withdrawn. See Debtor Exhibit S.

Class 4 consists of the unsecured priority claim of the Texas Workforce Commission. The Class 4 claim is impaired under the Plan but is paid in full. Although the Commission initially objected to confirmation of the Plan, that objection has been withdrawn. See Debtor Exhibit T.

Class 5 consists of other unsecured priority claims. The Debtor is unaware of any Class 5 claims.

Class 6 consists of general unsecured claims. Unsecured claims are impaired under the Plan. Unsecured creditors will receive a 35% distribution on their allowed claims paid over 6 years without interest. The Debtor estimates that unsecured

claims will be allowed in the amount of approximately $709,000. Unsecured creditors voted unanimously to accept the Plan.

Class 7 consists of the interests in the Debtor. The Debtor's stock is cancelled under the Plan. Kester is the sole shareholder of the Debtor and has agreed to pay $50,000 for the stock of the Reorganized Debtor to be issued under the Plan.

## II. CIT'S OBJECTIONS TO CONFIRMATION

### A. 11 U.S.C. § 1129(a)(1).

CIT contends that the Plan does not comply with section 1129(a)(1) of the Code. Specifically, CIT contends that the permanent injunction (Plan, section 11.03) and temporary injunction (Plan, section 11.04) provisions of the Plan improperly discharge non-debtor third parties in violation of section 524(e) of the Code. Each Plan provision will be analyzed separately.

### 1. The Permanent Injunction.

Section 11.03 of the Plan provides that "[c]onfirmation of the Plan shall result in the issuance of a permanent injunction against the commencement or continuation of any judicial, administrative, or other action or proceeding on account of any Claims against the Debtor, the Reorganized Debtor, *and any other entity against whom prosecution of the [sic] any Claims could result in a Claim being asserted against the Reorganized Debtor.*" See Plan, section 11.03 (emphasis added). CIT relies on *American Hardwoods, Inc. v. Deutsche Credit Corp., (In re American Hardwoods, Inc.),* 885 F.2d 621 (9th Cir. 1989) and *Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746 (5th Cir.1995) to support its conclusion that section 11.03 of the Plan violates section 524(e) of the Code.

In *American Hardwoods,* the debtors filed an adversary proceeding seeking to preliminarily and permanently enjoin a creditor from pursuing a state court action against the guarantor of the debtors' loan. *See In re American Hardwoods,* 885 F.2d

at 622. The debtors argued that a permanent injunction is distinguishable from a discharge. The *American Hardwoods* court rejected this argument stating:

11 U.S.C. § 524(a)(2), however, describes the effect of a discharge "as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." We find [the debtor's] semantic distinction between a permanent injunction and a discharge unpersuasive. A discharge under section 524(a)(2) does not void *ab initio* a liability. Rather, section 524 constructs a legal bar to its recovery. A discharge is in effect a special type of permanent injunction. [The debtor] seeks the same. The permanent injunction requested by [the debtor] falls squarely within the definition of a discharge under Section 524(a)(2) [The debtor] requests "an injunction against ... an action ... to collect ... [a] debt." We therefore conclude that the specific provisions of section 524 displace the court's equitable powers under section 105 to order the permanent relief sought by [the debtor].

*In re American Hardwoods,* 885 F.2d at 626 (citations omitted). The Fifth Circuit followed *American Hardwoods* in *Zale,* holding that it "must overturn a § 105 injunction if it effectively discharges a non-debtor." *See In re Zale,* 62 F.3d at 760.

However, other courts, principally in large, complex, mass tort-type bankruptcy cases, have approved plans containing broad third party releases and permanent injunctions to enforce those releases. *See, e.g., In re Dow Corning Corporation,* 255 B.R. 445 (E.D.Mich.2000); *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 293 (2d Cir.1992); *In re A.H. Robins Co.,* 880 F.2d 709, 749 (4th Cir.1989); *In re A.H. Robins* Co., 880 F.2d 694 (4th Cir. 1989); *MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89 (2d Cir.1988). In these

cases, the courts have analyzed several factors in evaluating whether a release/permanent injunction in favor of a non-debtor third party was appropriate including:

(1) The third party has made an important contribution to the reorganization;

(2) The release is "essential" or "important" to the reorganization;

(3) A large majority of the impacted creditors has approved the plan containing the release;

(4) A close connection between the cases against the third party and the case against the debtor exists; and

(5) The plan provides for payment of substantially all of the claims affected by the release.

These factors are not "rigid" and it is not necessary to establish all of them. *See In re Master Mortgage Invest. Fund,* 168 B.R. 930, 935 (Bankr.W.D.Mo.1994) ("The courts seem to have balanced the five listed factors most often.").

■ The Court does not have to reach the issue of whether the Plan's permanent injunction in favor of non-debtor third parties violates section 524(e) of the Code. Rather, the Court concludes that section 11.03 of the Plan (the permanent injunction provision) conflicts with section 11.04 of the Plan (the temporary injunction provision). These two provisions are irreconcilable as they relate to non-debtor third parties. The Court cannot approve the Plan while it contains inconsistent provisions with respect to protection for non-debtor third parties. If the Court granted the permanent injunction, there would be no need for the temporary injunction. Conversely, if what the Debtor really seeks is a temporary injunction restraining collection efforts with respect to sums being paid under the Plan, a permanent injunction is inconsistent with that remedy.

In light of the January 3, 2001 modification to section 11.04 of the Plan (to allow CIT to immediately pursue Kester on the Guaranty for any sums not being paid under the Plan), the Court believes that what the Debtor intends is a temporary injunction restraining creditors' collection efforts against non-debtor third parties while the Plan is being performed. However, given the Debtor's failure to modify section 11.03 to delete the reference to non-debtor third parties, the Plan as currently written is internally inconsistent and cannot be confirmed.[1]

### 2. The Temporary Injunction.

■ CIT contends that the temporary injunction provided in section 11.04 of the Plan violates section 524(e) of the Code. As noted, section 524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt." 11 U.S.C. § 524(e). Section 11.04 of the Plan provides:

11.04. *Temporary Injunction.* Upon Confirmation of the Plan, all creditors of Debtor having an Allowed Claim herein shall be temporarily enjoined, pursuant to Section 105 of the Code, from proceeding against any officer, director, shareholder, employee, or other responsible person of Debtor, individually, including, but not limited to, Earl and Linda Kester, for the collection of all or any portion of their Allowed Claim, said injunction to remain in effect only for so long as the Debtor complies with the terms of the Plan. Any violation of the Plan that remains uncured for thirty (30) days after receipt by the Debtor of written notice from any party affected by such violation, shall automatically and without order of the Court result in the dissolution of the injunction granted hereunder as to said affected party. Notwithstanding the foregoing, the injunction granted hereunder shall not af-

---

1. The Court will address CIT's remaining objections to confirmation. If the Court is correct, and the failure to conform section 11.03 of the Plan was inadvertent, the Debtor can file a motion to modify the Plan and to reconsider the Order denying confirmation.

fect the claims and rights of CIT to proceed against Earl Kester for collection on his personal guaranty of the Debtor's obligations to CIT under the pre-Petition Date loan agreements between CIT and the Debtor; *provided however*, that CIT *is* temporarily enjoined hereunder from proceeding against Earl Kester for collection of any amounts paid or to be paid by the Debtor under the Plan.

*See* Plan, section 11.04.

The Court disagrees that the temporary injunction proposed in the Plan affects Kester's liability to CIT on the Guaranty. While the Plan, if confirmed, will temporarily enjoin CIT from pursuing Kester for those sums being paid to it under the Plan, Kester's *liability* to CIT on the Guaranty is not affected. If the Reorganized Debtor defaults on the Plan after notice and an opportunity to cure, the temporary injunction terminates without further order of the Court and CIT can pursue Kester on the Guaranty for any amounts owing to it. Moreover, after the January 3, 2001 modification to section 11.04, if any portion of CIT's claim is not allowable in this bankruptcy case, but is otherwise recoverable pursuant to the Guaranty, CIT can pursue Kester now for any amounts not being paid under the Plan. Section 11.04 of the Plan does not violate section 524(e) of the Code.

■ CIT next contends that this Court is without "power" to grant the temporary injunction provided in section 11.04, and thus, the Plan cannot be confirmed. CIT cites no cases in support of this contention. Instead, CIT notes that it can find no reported decision where a temporary injunction like that proposed here has been granted by a bankruptcy court, and notes further that the only cases where temporary injunctions have been granted in favor of non-debtor third parties involve injunctions entered during a case to facilitate the debtor's efforts to formulate a plan of reorganization. *See* Supplemental

Brief of CIT (filed on January 3, 2001) at pp. 8–12.

Before a temporary injunction restraining CIT's collection efforts against Kester on the Guaranty is proper, the Court must have jurisdiction over that dispute. Bankruptcy courts have jurisdiction over actions "arising under" title 11, "arising in" a case under title 11, or "related to" a case under title 11. *See* 28 U.S.C. §§ 1334(b) and 157(a); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995); *In re Zale*, 62 F.3d at 751–52; *In re Wood*, 825 F.2d 90, 93 (5th Cir.1987). An action between CIT and Kester on the Guaranty is not an action "arising under" title 11 or "arising in" a case under title 11. Thus, the first question is whether such an action is "related to" the Debtor's Chapter 11 case.

In *Celotex Corp. v. Edwards*, 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), the Supreme Court agreed with the views expressed by the Third Circuit in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (1984), that the "related to" language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simple proceedings involving the property of the debtor or the estate. The Court noted that:

In attempting to strike an appropriate balance, the Third Circuit in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (1984), devised the following test for determining the existence of "related to" jurisdiction: "the usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.... Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively), and which in any way im-

pacts upon the handling and administration of the bankrupt estate." The First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have adopted the *Pacor* test with little or no variation.

514 U.S. at 308 n. 6, 115 S.Ct. 1493. As the Supreme Court noted in *Celotex,* the Fifth Circuit had already adopted the *Pacor* test for determining whether a matter is "related to" a bankruptcy case. *See In re Wood,* 825 F.2d at 93. The Circuit reaffirmed its earlier "related to" jurisdiction holding in *In re Zale,* 62 F.3d at 752.

Under this definition of "related to" jurisdiction, an action by CIT against Kester on the Guaranty is "related to" this bankruptcy case. Kester is the Debtor's founder, President, and sole shareholder. Kester guaranteed payment of the Debtor's obligations to CIT pursuant to the Guaranty. The evidence is undisputed that if CIT successfully pursued Kester on the Guaranty, Kester would not be able to satisfy CIT's claims and CIT would be entitled to execute against Kester's stock ownership in the Debtor, prompting Kester's resignation as President and the cessation of his involvement in the business. The evidence is also undisputed that if Kester was no longer affiliated with the Debtor, other key managers would leave, as would key customers. The record is clear—Kester's continued participation and involvement is essential to the Debtor's business operations and will be essential to the Debtor's successful reorganization under the Plan. Thus, an action by CIT to enforce the Guaranty "could conceivably" affect the Debtor's successful reorganization, *Celotex,* 514 U.S. at 308, n. 6, 115 S.Ct. 1493, and "related to" jurisdiction exists. *See In re Meadowbrook Estates,* 246 B.R. 898 (Bankr.E.D.Ca.2000) (finding that "related to" proceedings include civil proceedings that take place between third parties "such as a suit between a creditor and a guarantor of the debtor's obligation") (citation omitted); *Boco Enter., Inc. v. Saastopankien Keskus–Osake–Pankki (In re Bocco*

*Enter., Inc.),* 204 B.R. 407 (Bankr.S.D.N.Y. 1997) (action by creditor against guarantor was "related to" bankruptcy case where guarantor was officer, director, and shareholder of debtor); *Hunnicutt Co., Inc. v. TJX Cos., Inc. (In re Ames Dep't. Stores, Inc.),* 190 B.R. 157, 160 (S.D.N.Y.1995) (finding claim against guarantor "related to" bankruptcy case where "the outcome of the dispute has the potential to alter the distribution of the debtor's estate to creditors"); *Widewaters Roseland Center Co. v. TJX Cos., Inc.,* 135 B.R. 204, 207–08 (N.D.N.Y.1991) (finding suit against non-debtor guarantor had "significant connection" with bankruptcy case and was "related to" the case because suit might result in either plaintiff or non-debtor guarantor having claims against estate).

■ Having satisfied itself that jurisdiction to issue the temporary injunction exists, the Court must decide if it is appropriate for the Court to exercise its power under section 105 of the Code and issue such an injunction as part of confirmation. *In re Zale,* 62 F.3d at 751. While CIT is correct that the reported decisions granting temporary injunctive relief in favor of non-debtor third parties generally involve injunctions issued during the case to facilitate the formulation of a plan of reorganization, the Court sees no reason why a temporary injunction cannot be entered at confirmation to facilitate the successful implementation of such a plan.

In *Zale,* the Fifth Circuit noted that:
While a temporary stay prohibiting a creditor's suit against a nondebtor ... during the bankruptcy case may be permissible to facilitate the reorganization process in accord with the broad approach to nondebtor stays under section 105(a) ..., *the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor.* Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any

countervailing justification of debtor protection.... *The impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions.* Such an injunction may be proper under unusual circumstances. These circumstances include (1) when the non-debtor and the debtor enjoy such an identity of interest that the suit against the non-debtor is essentially a suit against the debtor, and (2) when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization. When either of these circumstances occur, an injunction may be warranted.

*Id.* at 761 (emphasis added) (citations omitted). Although dicta, the *Zale* court clearly recognized that circumstances may arise in a bankruptcy case warranting the issuance of a temporary injunction of third party actions as a part of confirmation.

The Debtor has satisfied the *Zale* unusual circumstances test. Kester and the Debtor enjoy an identity of interest. Kester guaranteed payment of the Debtor's obligations to CIT. A suit against Kester is essentially a suit against the Debtor. As noted previously, the record is undisputed—Kester is vital to the Debtor's successful reorganization. *See supra* at p. 476.

Finally, the Court must consider the traditional factors governing the issuance of temporary injunctions. *See Commonwealth Oil Ref. Co. v. U.S.E.P.A. (In re Commonwealth Oil Ref. Co.),* 805 F.2d 1175, 1188–89 (5th Cir.1986) ("[T]he legislative history of § 105 makes clear that stays under that section are granted only under the usual rules for the issuance of an injunction."). The four prerequisites to the issuance of such an injunction are: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause to the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest. *Id.* at 1189. For the reasons set forth below, the Court finds that each of these prerequisites is satisfied here.

Chapter 11 of the Code was adopted to give businesses in financial difficulties an opportunity to reorganize their business affairs, provide repayment to their creditors, and emerge from their bankruptcy case in a financially sound manner. The evidence is undisputed here that the Debtor can reorganize its financial affairs, emerge from its bankruptcy case, and pay all secured and unsecured priority claims in full with interest and provide a 35% distribution to its general unsecured creditors over 6 years without interest. *See* Debtor's Exhibits I, J, K, and L (financial projections showing Debtor's ability to successfully implement the Plan). In a liquidation, unsecured priority claims and general unsecured claims would receive no distribution. *See* Debtor's Exhibit R.

As the Code contemplates, the Debtor should be given the opportunity to successfully reorganize. That opportunity to successfully reorganize is substantially threatened if CIT is not restrained from its efforts to collect those sums being paid to it under the Plan from Kester pursuant to the Guaranty.

The harm to the Debtor—the inability to successfully reorganize—outweighs the harm to CIT. If the Plan is confirmed, CIT is free to pursue Kester on the Guaranty for any amounts owing to it that are not being paid under the Plan and, if the Debtor defaults on its plan payments to CIT after notice and an opportunity to cure, CIT may pursue Kester for all amounts owing to it without further order of the Court. The injunction expires on its own upon an uncured default. The only harm to CIT is that it may be forced to accept payment terms under the Plan that it finds unacceptable.[2]

---

**2.** CIT's objections to its treatment are discussed *infra* at pp. 481–84.

The granting of a temporary injunction does not disserve the public interest. Issuance of the injunction will facilitate the Debtor's successful reorganization which is in the public's interest. For all of these reasons, the temporary injunction provided in section 11.04 of the Plan is proper. CIT's objection to confirmation is overruled.

### 3. The Absence of an Adversary Proceeding.

■ CIT contends that the Plan cannot be confirmed because the Debtor failed to seek the requested injunctions by adversary proceeding in accordance with Bankruptcy Rule 7001. However, during argument on its oral motion to deny confirmation pursuant to Fed.R.Civ.P. 52(c), CIT admitted that it had actually received all of the due process protections during the confirmation hearing process that would otherwise have been available to it if the Debtor had sought the Plan's injunctions through an adversary proceeding. *See* December 13, 2000 Transcript ("Dec. 13 Tr.") p. 168, lines 3–12 ("The Court: … But with respect to CIT, I'm hearing you say that you agree you were afforded equal protections in this contested matter as you would have been afforded them in an adversary proceeding. [Counsel for CIT]: That's probably procedurally due process, but, yes. I think the due process was probably addressed appropriately."). Thus, since CIT's rights were not adversely affected by the Debtor's failure to seek the injunctions through an adversary proceeding, CIT's objection to confirmation is overruled.[3] *See In re Zale*, 62 F.3d at 763 ("[P]arties have waived their right to

protest the lack of an adversary proceeding when the court afforded them all the protections of an adversary proceeding. …"); *In re American Dev. Int'l. Corp.*, 188 B.R. 925, 935 (N.D.Tex.1995) (where rights of affected parties have been adequately protected and affected parties have had an opportunity to be heard, form should not be elevated over substance).

### B. 11 U.S.C. § 1129(a)(2) and (4).

■ CIT contends that the Plan cannot be confirmed because the Debtor has not complied with the applicable provisions of Chapter 11 and because of certain improper payments made without Court approval. CIT contends that the Debtor cannot confirm a plan of reorganization as a sanction for its earlier unauthorized use of cash collateral, its unauthorized payment of prepetition claims of employees, and its unauthorized payment to its accountant.

It is undisputed that this case got off to a bad start. The Debtor did use CIT's cash collateral without consent or an order of this Court in violation of section 363 of the Code. The Debtor also paid prepetition claims of employees without Court approval. CIT has raised these issues before. When the issues were first raised, the Debtor's former counsel admitted that he was responsible for the Debtor's unauthorized use of cash collateral. Moreover, Kester candidly testified that when he was advised that he could pay his employees during the case without Court approval, he did not understand that he could not pay the prepetition wages owing to them without Court approval. The Court is satisfied that the Debtor's payment of prepetition

---

**3.** After admitting that its due process rights were fully protected by the confirmation process, CIT continued its objection to the absence of an adversary proceeding on behalf of other creditors. CIT has no standing to so object. *See, e.g., In re Tascosa Petroleum Corp.*, 196 B.R. 856, 863–64 (D.Kan.1996) (finding that creditor lacked standing to object to confirmation of portions of Chapter 11 plan that did not affect its direct interests or

to assert rights of other creditors); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D.Ga.1988) ("Anchor Bank lacks standing, however, to argue on behalf of the other lienholders who, after due notice and opportunity to be heard, either never objected or filed objection to Debtor's motion and withdrew them during the hearings."). *See generally* Lawrence P. King, 7 COLLIER ON BANKRUPTCY ¶ 1109.04[4] (15th Ed.2000).

employee claims resulted from an honest mistake as to the requirements of the Code. The Debtor substituted new counsel after these, and other, issues arose. Since that time the Debtor has complied with the requirements of the Code.

Legally, CIT's contention is premised on an overly broad reading of section 1129(a)(2) of the Code. Most courts that have analyzed section 1129(a)(2) have concluded that the "principal purpose of § 1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the disclosure requirements of § 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the plan." *See In re Trans World Airlines, Inc.,* 185 B.R. 302, 313 (Bankr. E.D.Mo.1995); *see also In re City of Colorado Springs Spring Creek General Improvement District,* 177 B.R. 684, 688 (Bankr.D.Colo.1995); *In re Frontier Airlines, Inc.,* 93 B.R. 1014 (Bankr.D.Colo. 1988); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 759 (Bankr. S.D.N.Y.1992); *In re Toy and Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr. S.D.N.Y.1984). After recognizing that some courts interpret section 1129(a)(2) as CIT contends here, a leading bankruptcy commentator notes:

> More sensible are those interpretations that read "complies with the applicable provisions of this title" to mean "complies with the provisions of this title applicable to reorganization." Some courts have reached this conclusion through application of a harmless error standard, applicable if the transaction is trivial, or if the plan proponent has attempted and completed full cure of the wrong.

Lawrence P. King, 7 Collier On Bankruptcy ¶ 1129.03[2] (15th Ed.2000).

The Plan complies with section 1129(a)(2). CIT's objection to confirmation is overruled.

■ CIT next contends that the Plan cannot be confirmed because the Debtor improperly paid monies to its accountant during the case without a Court order in violation of section 1129(a)(4) of the Code. Again, this contention is premised on an overly broad reading of section 1129(a)(4).

The undisputed evidence is that a check was written to the Debtor's accountant to reimburse him for an expense he incurred, on the Debtor's behalf, with a third party vendor who upgraded software for the Debtor's financial systems. As a Chapter 11 debtor-in-possession, the Debtor can incur obligations in the ordinary course of business without Court approval and must then pay those post-petition claims in the ordinary course. *See* 11 U.S.C. § 363(c)(1). Thus, if the Debtor had contracted directly with the third party vendor to have these software upgrades performed, the expense would have been paid by the Debtor in the ordinary course of business and CIT would have no basis for objection. CIT apparently contends that because the Debtor's accountant made the arrangements for these software upgrades on the Debtor's behalf and payment flowed through him, section 1129(a)(4) was violated. The Court disagrees and CIT's objection to confirmation is overruled.

### C. 11 U.S.C. § 1129(a)(3).

■ While CIT did not file a written objection to confirmation raising this issue, it argued the Debtor's lack of good faith in its closing argument. CIT contends that the Plan was not proposed in good faith because the liquidation values relied upon by the Debtor at confirmation are inconsistent with earlier liquidation values relied upon by the Debtor in connection with cash collateral hearings.

On August 21, 2000, Kester testified that CIT was oversecured, even if its collateral was liquidated. Kester testified to higher liquidation values for the inventory and receivables in August, 2000 than he did at confirmation. *See* Debtor's Exhibit R. However, Kester explained those differences in value to the Court's satisfaction. Specifically, Kester explained that the "ga-

rage sale" values he testified to on August 21, 2000 were premised upon an assumption that he would participate in the liquidation of the assets. Conversely, the values set forth in Debtor's Exhibit R are an estimate of the amounts a Chapter 7 trustee would receive for the inventory and receivables after conversion of the case. Kester testified that he believed he could liquidate the assets for more than a Chapter 7 trustee because of his familiarity with the customers owing the accounts and his knowledge of the business generally. Kester's explanation of the differences in value is credible.

The Fifth Circuit addressed the Code's good faith requirement in *In re T–H New Orleans Ltd. Partnership,* 116 F.3d 790 (5th Cir.1997), stating:

> The requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start. Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied. A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable.

*Id.* at 802 (citations omitted.).

Applying the *T–H New Orleans* analysis here, the Court is satisfied that the Plan was proposed in good faith and satisfies section 1129(a)(3) of the Code. CIT's objection to confirmation is overruled.

### D. 11 U.S.C. § 1129(a)(7).

▇ CIT contends that the Plan fails to satisfy the best interest of creditors test

under section 1129(a)(7) of the Code. To satisfy the best interest test, the Court must find that each creditor that did not vote to accept the Plan is receiving at least as much under the Plan as that creditor would receive in a Chapter 7 liquidation of the Debtor. 11 U.S.C. § 1129(a)(7); *see Beal Bank, SSB. v. Waters Edge Ltd. Partnership,* 248 B.R. 668, 689–90 (D.Mass.2000); *Corestates Bank, N.A. v. United Chemical Tech., Inc.,* 202 B.R. 33, 56 (E.D.Pa.1996); *In re Dow Corning,* 244 B.R. 678, 686 (Bankr.E.D.Mich.1999).

CIT admits that it has no best interest objection of its own.[4] CIT, the Class 2 creditor, is paid in full under the Plan and would either be slightly undersecured in a Chapter 7 liquidation, *see* Debtor's Exhibit R (which estimates that CIT would not be paid in full in a Chapter 7 liquidation), or would be paid in full.[5] In either event, CIT is receiving at least as much under the Plan as it would receive in a Chapter 7 liquidation and the best interest test is satisfied.

▇ No Class 1 creditor voted to accept the Plan. However, Class 1 creditors are paid in full under the Plan, *see* Plan, section 5.01, and this treatment satisfies the best interest test. Class 3 creditors are unimpaired under the Plan and the best interest test is not applicable to them. *See* 11 U.S.C. §§ 1124(*l* ), 1126(f), and 1129(a)(7)(defining impairment, providing that only impaired creditors get to vote on a plan, and providing that best interest test must be satisfied with respect to creditors who did not vote to accept the plan, respectively); *see also Continental Sec. Corp. v. Shenandoah Nursing Home Partnership,* 193 B.R. 769, 776 (W.D.Va.1996); Lawrence P. King, 7 COLLIER ON BANKRUPTCY ¶ 1129.03[7][a] (15th Ed.2000) ("Section

---

**4.** *See* January 8, 2000 Transcript ("Jan. 8 Tr.") p. 69, lines 6–8 ("The Court: Let's come back to the best interest argument. That didn't really apply to you. [counsel for CIT]: No.").

**5.** *See* December 5, 2000 Transcript ("Dec. 5 Tr.") at p. 54, lines 2–5 ("Q. Is it possible that CIT ... could be slightly over secured as opposed to slightly under secured in a liquidation? A. I think so. It's very very close.").

1129(a)(7) begins by stating that it applies '[w]ith respect to each *impaired* class of claims or interests. . . .' This restricts its application only to creditors or interest holders who are members of *impaired* classes.") (emphases in original).

The evidence is undisputed that unsecured priority claims (Classes 4 and 5) and general unsecured claims (Class 6) would receive no recovery in a Chapter 7 liquidation of the Debtor. *See* Debtor's Exhibit R. Under the Plan, unsecured priority claims will be paid in full, with interest, and general unsecured claims will receive a 35% distribution on their allowed claims over 6 years without interest. *See* Plan, sections 5.02, 5.03, and 5.04, respectively. This treatment satisfies the best interest test of section 1129(a)(7) of the Code. CIT's objection to confirmation is overruled.

### E. 11 U.S.C. § 1129(b)(2)(A).

Because CIT objects to confirmation of the Plan, confirmation must be considered under the "cram down" provisions of section 1129(b) of the Code. Accordingly, the Debtor's inability to satisfy the requirements of section 1129(a)(8) (plan acceptance by all classes) is immaterial, so long as the Debtor can establish that the Plan does not discriminate unfairly against CIT and that the treatment provided to CIT is fair and equitable. 11 U.S.C. § 1129(b)(1).

CIT contends that the Plan does not meet this test because its claim is "split" under the Plan, the Plan does not fully provide for CIT's secured claim, and the Plan fails to provide CIT with an adequate interest rate (and other terms of repayment) to assure that the deferred payments under the Plan equal the present value of CIT's allowed secured claim. Each issue will be addressed separately.

### 1. The Split of CIT's Claim.

▮ The parties agree that CIT is a fully secured creditor with a claim under the Prepetition Loan Agreement (which consists of a revolving line of credit and a term loan). *See* CIT Exhibits 1–6; *see also* CIT's Proof of Claim, CIT Exhibit 19. The revolver and the term loan are treated differently under the Prepetition Loan Agreement and the underlying loan documents. *See* CIT Exhibit 1. All of the Debtor's obligations to CIT under the Prepetition Loan Agreement are cross-collateralized. *See id.*

The Debtor proposes to modify the Prepetition Loan Agreement under the Plan. If the Plan is confirmed, the Debtor will execute a new loan agreement and two promissory notes[6] in favor of CIT which will be cross-collateralized, cross-defaulted, and secured by all property securing CIT's prepetition claim, which liens will extend to property "now owned or hereafter acquired." *See* Debtor's Exhibit N (Class 2 Loan Agreement) at § 1.3.

CIT contends that the Plan improperly "splits" CIT's secured claim in violation of sections 506(a), 1122 and 1129(b)(2) of the Code because it receives two notes under the Plan when it previously held only one note. CIT relies on *In re Ionosphere Clubs, Inc.*, 134 B.R. 528 (Bankr.S.D.N.Y. 1991) in support of its contention that the Plan cannot "split" its claim.

While CIT correctly cites the holding of *Ionosphere*—one lien, one claim—, *Ionosphere* is distinguishable and is not controlling here. The "claim splitting" at issue in *Ionosphere* involved three series of secured bonds issued under the same indenture but with different trustees and different priorities to the collateral. The collateral was not sufficiently valuable to fully secure the face amount of all three series of bonds. The court had to decide "whether, under § 506(b), the three series [of bonds] hold three separate secured claims or are co-owners of one secured claim." *Id.* at 531. The indenture trustee for the holders of the series of bonds with

---

**6.** The Debtor proposes to issue two notes to CIT containing different repayment terms, one note evidencing the prior term loan and one note evidencing the prior revolver.

the first priority argued that there were three separate claims, such that the first priority claims were oversecured and should receive post-petition interest on their claims before principal was returned to the holders of the two series of bonds with second and third priority to the collateral. The court disagreed, holding that the three series of bonds were co-holders of a single undersecured claim.

*Ionosphere* arose in a different procedural context and presented a different issue from that presented here—one group of creditors was trying to gerrymander their status under section 506(a) of the Code to the prejudice of other creditors under the same indenture. There, the court's determination affected the creditors' rights among themselves as well as their right to recover interest from the estate. Here, CIT remains fully secured under the Plan, is paid in full with interest, and is not prejudiced by the issuance of two notes—instead of one—under the Plan. CIT's objection is overruled.

### 2. Provision for CIT's Allowed Secured Claim.

CIT contends that the Plan fails to provide for the entirety of CIT's secured claim. While correct when filed, this objection is now moot.

The Debtor objected to CIT's secured proof of claim. Unless the objection is resolved by agreement, the Court will determine CIT's allowed secured claim in the case. While the Plan initially provided for the payment of the Debtor's view of CIT's allowed secured claim, the Debtor has clarified the Plan and now agrees that it must pay CIT's allowed secured claim as determined by final order of the Court. The Debtor introduced financial projections at confirmation showing that the Debtor could repay CIT's claim under the Plan, regardless of who prevailed at the claim objection hearing. *See* Debtor's Exhibit I, J, K, and L.

### 3. The Interest Rate, Retention of Liens, and Financial Covenants

While CIT agrees that "[a]s a general matter, the Plan appears to make an attempt to comply with Sec. [sic] 1129(b)(2)(A)(i)," it contends that its treatment is insufficient to satisfy the requirements for confirmation under section 1129(b)(2)(A)(i). *See* CIT's Objection to First Amended Plan of Reorganization, filed November 27, 2000, at p. 8. In particular, CIT contends that it does not retain sufficient lien rights under the Plan, that the Plan does not provide sufficient detail as to the terms of its treatment (*i.e.,* covenants and events of default), and that the interest rate proposed in the Plan is insufficient to cause CIT to receive deferred cash payments having a present value, as of the effective date of the Plan, equal to its allowed secured claim.

While the First Amended Plan did not set forth all of the terms of repayment CIT properly sought to understand and evaluate, the Second Amended Plan addressed CIT's objections and clarified CIT's treatment. The Debtor also provided CIT with its proposed Class 2 Loan Agreement, the Class 2A Note, and the Class 2B Note. *See* Debtor's Exhibits N, O, and P.

CIT filed its Supplemental Objection to the Second Amended Plan on December 1, 2000, pointing out that the proposed Class 2 Loan Agreement voided most of the covenants that had protected CIT's lien rights under the Prepetition Loan Agreement. *See* Supplemental Objection at ¶¶ 13 and 14. The Debtor amended the Class 2 Loan Agreement to provide the covenant protections that CIT desired.

The Plan and the proposed plan implementation documents now provide that CIT retains its prepetition liens and that those liens extend to assets "now owned or hereafter acquired," *see* Class 2 Loan Agreement at § 1.3, and now provide CIT with sufficient covenants to protect its interests in its collateral. *See id.* at Section 3 (entitled "Inspection of Collateral; Fur-

ther Assurances; Covenants"), §§ 3.1—3.15. CIT's objections are moot.

■ Finally, CIT contends that it is not receiving deferred cash payments under the Plan that have a present value equal to its allowed secured claim. CIT contends that it must receive interest at the contract rate provided in the Prepetition Loan Agreement—rather than the lesser interest rate provided in the Plan—in order for it to receive deferred cash payments with a proper present value.[7] *See* CIT's Objection to First Amended Plan at ¶ 29. Under the Class 2A Note and the Class 2B Note, CIT receives a variable rate of interest equal to the Prime Rate (as defined) plus 2%, adjusted annually and capped at 13.5% per annum. Under the Prepetition Loan Agreement, the pre-default rate of interest was prime plus 3.75% per annum.

The present value analysis associated with the deferred cash payment requirement of section 1129(b)(2)(A)(i) is controversial. This present value requirement, which compensates the secured creditor for the delay in receiving payments in respect of its allowed secured claim, includes, by definition, an interest component. The Bankruptcy Code is silent, however, as to the rate of interest necessary to permit a secured creditor to obtain the present value of its allowed secured claim.

In *Heartland Federal Sav. & Loan Assoc. v. Briscoe Enter., Ltd., II (In re Briscoe Enter., Ltd., II)*, 994 F.2d 1160, 1169 (5th Cir.1993), the Fifth Circuit noted that "[c]ourts have used a wide variety of different rates as benchmarks in computing the appropriate interest rate (or discount rate as it is frequently termed) for the specific risk level in their cases." *See id.* In *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 800 (5th Cir.1997), the Fifth Circuit was "asked to establish a particular formula for determining an appropriate cramdown interest rate" and declined to do so. After quoting the above language from its earlier decision in *Briscoe II*, the Court stated:

> We will not tie the hands of the lower courts as they make the factual determination involved in establishing an appropriate interest rate; they have the job of weighing the witness' testimony, demeanor and credibility. Thus, absent clear error, we will not disturb the bankruptcy court's determination.

*Id.* After repeating its earlier comments in *Briscoe II* that "[o]ften the contract rate will be an appropriate rate" and that "[n]umerous courts have chosen the contract rate if it seemed to be a good estimate as to the appropriate discount rate," *id.* at 801, the Court upheld the bankruptcy court's determination that the contract rate was the appropriate interest rate in that case.

Here, both the Debtor and CIT offered testimony with respect to the appropriate interest rate to be provided to CIT under the Plan. The Debtor's expert, Jeff Fritts ("Fritts"), testified that after considering all of the circumstances, the terms of the Class 2A Note, the Class 2B Note, and the Class 2 Loan Agreement were commercially reasonable.[8] Dec. 13 Tr. at p. 118, lines

---

**7.** Notwithstanding the contract rate position in its objection, CIT's loan officer testified that the contract rate would not adequately compensate CIT for the risk associated with the loan CIT was being forced to make to the Debtor under the Plan. *See* Jan. 8 Tr. at pp. 44–45. This inconsistency in position was troubling when the Court evaluated the competing witness testimony on the interest rate issue.

**8.** On cross-examination, Fritts admitted that the absence of covenants in the Class 2A Loan

Agreement would be of concern to him as a lender, Dec. 13 Tr. at p. 137, lines 7–17, that it would be "reasonable" to expect the Debtor to agree to those kinds of covenants, *id.* at pp. 133–137, and that in the absence of covenants, he would not make the loan. *Id.* at p. 137, lines 13–17. The Debtor agreed to modify the loan agreement to include the covenants stating that "I think Mr. Hesse is making a good point on these covenants. We did not focus on the terms of these covenants in drafting this note. I admit that we should

10–15. Fritts further testified that CIT should be able to sell the Class 2A Note and the Class 2B Note for enough to pay off its loan balance (*i.e.*, its allowed secured claim). Dec. 13 Tr. at p. 119, lines 6–10. Finally, Fritts testified that CIT was receiving a stream of payments under the Plan that had a present value equal to the amount of CIT's secured claim. Dec. 13 Tr. at p. 119, lines 11–24.

CIT's loan officer, Steven Siar ("Siar"), testified that he believed the Debtor is a worse credit risk now than it was at the time the original loans were made (Jan. 8 Tr. p. 39, lines 2–9); that the Plan's proposed interest rate is insufficient to compensate CIT for its increased risk (Jan. 8 Tr. p. 40, lines 15–18); and that CIT would not make the loan proposed under the Plan (Jan. 8 Tr. p. 43, lines 12–14). Siar testified further that the increased "riskiness" of the loan is a function of the Debtor's bankruptcy filing (Jan. 8 Tr. p. 39, line 5), its conduct immediately prior to and immediately after the filing (Jan. 8 Tr. p. 39, lines 5–8), a decline in the Debtor's business and in its market (Jan. 8 Tr. pp. 40–41), and a perceived increase in the risk of non-collection (Jan. 8 Tr. p. 45, lines 2–6).

After considering both witnesses' testimony, demeanor and credibility, the Court finds that the Plan provides deferred cash payments having a present value, as of the effective date of the Plan, equal to CIT's allowed secured claim. On a going concern basis, CIT is significantly oversecured. The interest rate proposed in the Plan (prime plus 2%, adjusted annually and capped at 13.5%) includes a risk premium sufficient to account for the fact that CIT is not receiving its money today. CIT's loan under the Plan is not riskier than its prepetition loan. The evidence is undisputed that the Debtor's financial projections take market and market share declines into account. Moreover, CIT's continuing concerns over the problems

that arose early in this case, now expressed as increased riskiness, have been addressed previously. *See supra* at pp. 478–79. The Plan interest rate is reasonable and adequately compensates CIT for risk. Thus, the Plan satisfies section 1129(b)(2)(A)(i) of the Code and CIT's objection to confirmation is overruled.

## III. OTHER CONFIRMATION REQUIREMENTS

All other requirements for confirmation of the Plan under section 1129(a) of the Code that are applicable to the Debtor are satisfied. In particular, the Plan satisfies section 1129(a)(5)—the Debtor has disclosed the identity and affiliations of those persons who will serve as officers and directors of the Debtor and the appointment of such persons is consistent with the interest of creditors and equity security holders and with public policy; section 1129(a)(10)—Class 6 is impaired under the Plan and voted to accept the Plan; section 1129(a)(11)—the Plan is feasible and confirmation of the Plan is not likely to be followed by a liquidation or the need for a further reorganization of the Debtor; and section 1129(a)(12)—the Plan properly provides for the payment of fees due under 28 U.S.C. § 1930.

Based solely on the inconsistencies between section 11.03 and 11.04 of the Plan, an order denying confirmation will be entered separately.

have done that ... so I apologize to Mr. Hesse and to the Court for having to go

through this, but I ... just didn't want to interrupt him earlier." *Id.* at p. 150–151.